**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LOCAL JOINT EXECUTIVE BOARD OF
LAS VEGAS,
                            *Petitioner,*

ARCHON CORPORATION,
                            *Intervenor,*

                v.

NATIONAL LABOR RELATIONS
BOARD,
                            *Respondent.*

No. 07-73979

NLRB No.
28-CA-13274

OPINION

On Petition for Review of an Order of the
National Labor Relations Board

Argued and Submitted
June 25, 2008—Pasadena, California

Filed August 27, 2008

Before: William C. Canby, Jr., Susan P. Graber, and
Richard A. Paez, Circuit Judges.

Opinion by Judge Paez

11849

## COUNSEL

Michael T. Anderson, Davis, Cowell & Bowe, LLP, San Francisco, California, for the petitioner.

Julie B. Broido and Gregory P. Lauro, National Labor Relations Board, Washington, D.C., for respondent.

## OPINION

PAEZ, Circuit Judge:

This is the second time that Petitioner Local Joint Executive Board of Las Vegas, Culinary Workers Union Local 226 and Bartenders Union Local 165 ("the Union")[1] petitions for our review of a National Labor Relations Board ("NLRB" or "the Board") order dismissing its consolidated complaints against Hacienda Resort Hotel and Casino and Sahara Hotel and Casino ("the Employers")[2] for unilaterally terminating dues-checkoff before bargaining to agreement or impasse. The dispute centers on the Board's application of the unilateral change doctrine as recognized by *NLRB v. Katz*, 369 U.S. 736 (1962). Under this doctrine, absent a waiver, an employer violates sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act ("NLRA" or "the Act"), 29 U.S.C. § 158(a)(1) and (5), if it makes a unilateral change in a term or condition of employment—so-called "mandatory subjects" of bargaining—without first bargaining over the relevant term. In our prior decision in this case, *Local Joint Executive Bd. of Las Vegas v. NLRB* (*LJEB I*), 309 F.3d 578 (9th Cir. 2002), we granted the Union's petition, vacated the Board's decision and remanded to the Board with instructions because we could not discern the Board's rationale for excluding, in the absence of union security, dues-checkoff from *Katz*' unilateral

[1]Petitioner Local Joint Executive Board of Las Vegas is a committee of two local labor unions, Culinary Workers Union Local 226 and Bartenders Union Local 165. Local 226 and Local 165 are affiliated with the Hotel Employees and Restaurant Employees International Union (AFL CIO).

[2]Archon Corporation is the Employers' successor in interest. We granted Archon Corporation's motion to intervene pursuant to Fed. R. Appellate P. 15(d).

change doctrine. In particular, we found that if "[t]he checkoff is merely a means of *implementing* union security [as in *Bethlehem Steel*] . . . such reasoning would not support the rule that the Board applies in this case." *Id.* at 584 (internal quotation marks omitted). We asked the Board to "articulate a reasoned explanation for the rule it adopted, or [to] adopt a different rule and present a reasoned explanation to support it." *Id.* at 586.

On remand, the Board reaffirmed its dismissal of the complaint but, reversing field, did not rely on the bright-line rule articulated in its original decision. *See Hacienda Hotel Inc., Gaming Corp.* (*Hacienda II*), ___ N.L.R.B. ___, 351 NLRB No. 32, 2007 WL 2899736, at *1 (Sept. 29, 2007). Instead, the Board interpreted the collective bargaining agreements ("the Agreements") and found, without resolving whether in the absence of union security dues-checkoff should be excluded from *Katz*' unilateral change doctrine, that the Union had explicitly waived any right of employees to claim dues-checkoff after the Agreements expired. *Id.* at *2-3. Accordingly, the Board dismissed the Union's complaint.

In its petition for review, the Union argues that the Board side-stepped the issue posed in our remand, but we conclude that the Board was responsive to our instruction to "adopt a different rule." *LJEB I*, 309 F.3d at 586. The Board's decision does not, however, properly apply the rule it adopted. Where a unilateral change is defended on a claim of contractual right, the alleged waiver must be—as the Board acknowledges on appeal—"clear and unmistakable." *Metro. Edison Co. v. NLRB*, 460 U.S. 693, 708 (1983). There is simply no clear and unmistakable waiver here. We again grant the petition for review, vacate, and remand.

## I.  Background ³

---

**³**We restate in part the facts of this case from our prior opinion, *see LJEB I*, 309 F.3d at 580-81.

The Employer and the Union had collective-bargaining relationships for more than thirty years. The 1989-1994 collective bargaining agreements (the "Agreements") were embodied in separate, but substantially identical documents. Each agreement contained the following dues-checkoff provision:

> The Check-Off Agreement and system heretofore entered into and established by the Employer and the Union for the check-off of Union dues by voluntary authorization, as set forth in Exhibit 2, attached to and made part of this Agreement, *shall be continued in effect for the term of this Agreement*.

(emphasis added). Exhibit 2 attached to each agreement provided:

> Pursuant to the Union Security provision of the Agreement between [name of hotel] and [the Union], the Employer, *during the term of the Agreement*, agrees to deduct each month Union membership dues (excluding initiation fees, fines and assessments) from the pay of those employees who have authorized such deductions in writing as provided in this Check-Off Agreement. Such membership dues shall be limited to amounts levied by the Unions in accordance with their Constitutions and Bylaws. Deductions shall be made only for those employees who voluntarily submit to the hotel employing them a written authorization in accordance with the "Authorization for Check-Off of Dues" form set forth below. It is the Union's responsibility to provide the employees with this form.

(emphasis added). The State of Nevada, where the Employers are located, is a "right-to-work" state.[4] As a result, under sec-

---

[4]Nevada's right-to-work law provides:

   [n]o person shall be denied the opportunity to obtain or retain

tion 14(b) of the Labor Management Relations Act ("LMRA"), 29 U.S.C.§ 164(b), the Agreements legally could not, and therefore did not, include a union security provision requiring union membership as a condition of employment.[5] The Agreements instead provided that the union-security clauses would become effective only if state law changed to allow union security.

The Agreements expired on May 31, 1994. The Employers continued to abide by the dues-checkoff arrangement for more than a year after this expiration date. In June 1995, however, after notifying the Union, the Employers ceased giving effect to the dues-checkoff provision in the expired Agreements and thereafter redirected amounts, which previously had been deducted and remitted to the Union, to their employees as part of their regular wages.

On October 26, 1995, the General Counsel for the Board issued consolidated complaints alleging that the Employers' unilateral termination of dues-checkoff, without bargaining to impasse, constituted an unfair labor practice in violation of sections 8(a)(1) and 8(a)(5) of the Act. The administrative law judge ("ALJ") dismissed the complaints. Relying on the language of the dues-checkoff provision, which stated that dues-checkoff would "continu[e] in effect for the term of this agreement," the ALJ concluded that "it is unnecessary to examine the state of the law on checkoff clauses, whether in

---

employment because of nonmembership in a labor organization, [n]or shall . . . any corporation, individual or association of any kind enter into any agreement, written or oral, which excludes any person from employment or continuation of employment because of nonmembership in a labor organization.

Nev. Rev. Stat. § 613.250.

[5]Section 14(b) of the LMRA permits states and territories to enact what are commonly known as "right-to-work" laws prohibiting "agreements requiring membership in a labor organization as a condition of employment." 29 U.S.C. § 164(b)

right-to-work [s]tates or otherwise" because "[t]he most reasonable interpretation . . . is that [dues-checkoff] would continue through the duration of the contract but would not survive thereafter."

On review, the Board affirmed the dismissal, but adopted a different rationale. *Hacienda Hotel, Inc. Gaming Corp.* (*Hacienda I*), 331 N.L.R.B. 665 (2000). Instead of relying on the language of the dues-checkoff provisions, the Board reasoned that the Employers' unilateral termination of dues-checkoff did not constitute an unfair labor practice under sections 8(a)(1) and 8(a)(5) of the Act because dues-checkoff was not subject to the *Katz* prohibition against unilateral change. *Id.* at 667. The Board traced its rule excluding dues-checkoff from the unilateral change doctrine to its decision in *Bethlehem Steel Co.*, 136 N.L.R.B. 1500, 1502 (1962), enforced in pertinent part, *Indus. Union of Marine & Shipbuilding Workers v. NLRB*, 320 F.2d 615, 621 (3d Cir. 1963). *Id.* at 666. As evidence that the rule was "well-established," the Board cited numerous Board and court decisions citing the holding of *Bethlehem Steel* for the proposition that an employer's checkoff obligation does not survive the contract that created the obligation. *Id.* at 666-67. Two members of the Board dissented, criticizing the Board's application of the holding in *Bethlehem Steel* to cases in which the collective bargaining agreement contained no union-security provision. *Id.* at 667-72.

The Union petitioned this court for review. On October 28, 2002, we granted review and vacated the Board's order. *LJEB I*, 309 F.3d at 580. We found that we could not discern the Board's rationale for excluding dues-checkoff from the unilateral change doctrine in the absence of a union security provision because the "Board's finding creates substantial ambiguity in the rationale underlying *Bethlehem Steel*'s holding regarding dues-checkoff." *Id.* at 584. We granted the petition for review, vacated the decision of the Board, and remanded for the Board to articulate a reasoned explanation

for the rule it adopted, or to adopt a different rule and present a reasoned explanation to support it. *Id.* at 585.

On remand, the parties filed position statements and four years later, on September 29, 2007, the Board reaffirmed its dismissal of the complaint but again changed course. Returning to the approach first adopted by the ALJ, the Board found that the dues-checkoff provisions in the collective-bargaining agreements contained explicit language limiting the Employers' dues-checkoff obligation to the duration of the Agreements.

> Not only does the dues-checkoff provision state that it "shall be continued in effect for the term of this Agreement," but also Exhibit 2, incorporated by reference in the checkoff provision, explicitly states that the Respondents agree to deduct monthly union dues "*during the term of the Agreement*" [emphasis added].

*Hacienda II*, 2007 WL 2899736, at *3. The Board determined that, "[w]here, as here, the dues-checkoff provision itself contains clear language linking dues-checkoff to the duration of the collective-bargaining agreement, as opposed to general durational language elsewhere[,] . . . the parties intended that dues checkoff would not survive expiration of the agreement." *Id.* Although the Board did not directly address the significance of any underlying statutory rights, the Board apparently concluded that these contractual provisions established that the Union had bargained away any statutory rights it might have had with respect to dues-checkoff. As the Board explained, the Union "explicitly waived any right to the continuation of dues checkoff as a term and condition of employment after expiration of the collective-bargaining agreement." *Id.*[6] Again, two members of the Board dissented, objecting to

---

[6]Although the Board's decision used neither the words "clear and unmistakable," nor included citations to the relevant case law, we agree with the Board's counsel that the appropriate analysis is whether the Union "clearly and unmistakably" waived its statutory protection against post-expiration termination of dues-checkoff.

the majority's interpretation of the relevant contractual language and arguing that a waiver of statutory protection against unilateral changes in this context would "effectively drain the *Katz* doctrine of any force." *Id.* at \*6.

On October 10, 2007, the Union filed a petition for review.

## II.  Standard of Review

The National Labor Relations Board "has the primary responsibility for developing and applying national labor policy." *NLRB v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, 786 (1990). Accordingly, we defer to its rules so long as "the NLRB's interpretation of the NLRA . . . is rational and consistent with the statute." *United Food & Commercial Workers Union, Local 1036 v. NLRB*, 307 F.3d 760, 766 (9th Cir. 2002) (en banc).

With respect to collective bargaining agreements, however, the Supreme Court has stressed that "the Board is neither the sole nor the primary source of authority in such matters." *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 202 (1991); *cf. NLRB v. C & C Plywood Corp.*, 385 U.S. 421, 428 (1967). The Board has a limited role in interpreting contracts because section 301 of the LMRA, 29 U.S.C. § 185, "authorizes *federal courts* to fashion a body of federal law for the enforcement of . . . collective bargaining agreements." *Litton*, 501 U.S. at 202-03 (quoting *Textile Workers Union of Am. v. Lincoln Mills of Ala.*, 353 U.S. 448, 451 (1957)). Accordingly, we review *de novo* the Board's interpretation of the Agreements. *NLRB v. Dist. Council of Iron Workers of Cal. & Vicinity*, 124 F.3d 1094, 1098 (9th Cir. 1997).[7]

---

[7]We need not address whether a different standard of review should apply if the Board appropriately referred to extrinsic evidence when interpreting a collective bargaining agreement. Here, the Board based its construction of the Agreements solely on the text of the relevant provisions.

## III.  Analysis

**[1]** Section 8(a)(5) of the NLRA makes it an unfair labor practice for an employer to "refuse to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5). Section 8(d) requires employers to bargain collectively before introducing changes "with respect to wages, hours, and other terms and conditions of employment." *Id.* § 158(d). An employer violates section 8(a)(5) by making any unilateral changes to the mandatory bargaining subjects covered by section 8(d). *See NLRB v. Wooster Div. of Borg-Warner Corp.*, 356 U.S. 342, 349 (1958).[8]

**[2]** In *Katz*, the Supreme Court affirmed the Board's determination that an employer violates sections 8(a)(5) and 8(a)(1) of the Act if it makes a unilateral change in a term or condition of employment—so-called "mandatory subjects" of bargaining—without first bargaining to impasse over the relevant term. *See, e.g.*, *Litton*, 501 U.S. 190. Agreement or impasse is required because the terms and conditions of employment continue in effect by operation of the NLRA; they are no longer agreed upon terms but terms imposed by law, at least in so far as there is no unilateral right to change them. *See id.* at 206-07 (stating that "the obligation not to make unilateral changes is rooted not in the contract but in preservation of existing terms and conditions of employment") (internal quotation marks omitted).[9] The Board has

---

[8]A violation of section 8(a)(5) is also a violation of section 8(a)(1), which makes it an unfair labor practice for an employer to "interfere with, restrain, or coerce employees in the exercise" of their statutory right to bargain collectively through representatives of their own choosing. 29 U.S.C. § 158(a)(1); *see also Standard Oil Co. of Cal. v. NLRB*, 399 F.2d 639, 642 (9th Cir. 1968).

[9]Most mandatory subjects of bargaining fall within the prohibition on unilateral change. The Board has carved out exceptions to the unilateral change rule including union-security and dues-checkoff provisions, and arbitration and no-strike clauses, *see Litton*, 501 U.S. at 198-200. As we held in *LJEB I*, however, the Board has not explained that why dues-

recognized, however, that a union can contractually waive statutory rights, including the right to bargain over changes in fringe benefits. *Gen. Tire & Rubber Co.*, 274 N.L.R.B. 591, 592 (1985); *Cauthorne Trucking*, 256 N.L.R.B. 721, 722 (1981). "Such waivers are valid because they 'rest on the premise of fair representation' and presuppose that the selection of the bargaining representative 'remains free.' " *Metro. Edison Co.*, 460 U.S. at 705 (quoting *NLRB v. Magnavox Co. of Tenn.*, 415 U.S. 322, 325 (1974)).

**[3]** The standard for waiving statutory rights, however, is high. Proof of a contractual waiver is an affirmative defense and it is the employer's burden to show that the contractual waiver is " 'explicitly stated, clear and unmistakable.' " *Silver State Disposal Serv. Inc.*, 326 N.L.R.B. 84, 86 (1998) (quoting *Lear Siegler, Inc.*, 293 N.L.R.B. 446, 447 (1989)); *accord Metro. Edison*, 460 U.S. at 708 (declining to "infer from a general contractual provision that the parties intended to waive a statutorily protected right unless the undertaking is 'explicitly stated' "). Equivocal, ambiguous language in a bargaining agreement, without more, is insufficient to demonstrate waiver. *See Tocco Div. of Park-Ohio Indus. Inc. v. NLRB*, 702 F.2d 624, 626 (6th Cir. 1983).

Waiver of a statutory right may be evidenced by bargaining history, but the Board requires "the matter at issue to have been fully discussed and consciously explored during negotiations and the union to have consciously yielded or clearly and unmistakably waived its interest in the matter." *Johnson-Bateman Co.*, 295 N.L.R.B. 180, 185 (1989). Because there

checkoff in the absence of union security should be excluded from the unilateral change doctrine. *LJEB I*, 309 F.3d at 582-84. The Board expressly declined to provide such an explanation in *Hacienda II*, but our holding requires the Board to provide a reasoned basis for its rule excluding dues-checkoff from the unilateral change doctrine in the absence of union security. Should the Board seek to apply that rule following this remand, our holding remains the law of this case.

is no factual development of such a history here,[10] the alleged waiver is based wholly on the "explicit language limiting the [Employers'] dues-checkoff obligation to the duration of the agreements." *Hacienda II*, 2007 WL 2899736, at *1.

Therefore, as the Board recently emphasized in its decision in *Provena Hospitals*, the Board has,

> in decisions too numerous to cite . . . applied the clear and unmistakable waiver analysis to all cases arising under Section 8(a)(5) where an employer has asserted that a [contractual] provision authorizes it to act unilaterally with respect to a particular term and condition of employment. . . .
>
> [t]he clear-and-unmistakable waiver standard . . . requires bargaining partners to unequivocally and specifically express their mutual intention to permit unilateral employer action with respect to a particular employment term, notwithstanding the *statutory* duty to bargain that would otherwise apply.

*Provena Hosps.*, ___ N.L.R.B. ___, 350 NLRB No. 64, 2007 WL 2375089 at *4-5 (Aug. 16, 2007) (footnote omitted) (emphasis added); *see also C & C Plywood*, 385 U.S. at 430 (approving of the Board's adoption of the clear-and-unmistakable standard). Although the Board has recently engaged in an internal debate over whether to abandon this standard, it has "specifically declined" to do so. *Provena Hosps.*, 2007 WL 2375089 at *5.[11] We turn to whether the

---

[10]In *American Distributing*, we noted that such a waiver can occur "by express contractual provisions, by bargaining history, or by a combination of the two." *Am. Distrib. Co. v. NLRB*, 715 F.2d 446, 450 (9th Cir. 1983). The Board has never suggested—nor has there been factual development in the record—that there was relevant bargaining history, union inaction, or that the parties had bargained to an impasse before the Employers terminated dues-checkoff.

[11]The competing standard is the so-called "contract coverage" standard, which originated in the District of Columbia Circuit and has since been

Board properly interpreted the Agreements when it found that the Union clearly and unmistakably waived its statutory rights.

## A.  "Clear and Unmistakable" Waiver

The Board argues that because "the dues-checkoff provision itself contains clear language linking dues-checkoff to the duration of the collective-bargaining agreements, as opposed to general duration language elsewhere in the agreement," the Union explicitly bargained away its rights. We disagree.

**[4]** Although a general durational clause, without more, does not defeat the unilateral change doctrine, *Honeywell Int'l, Inc. v. NLRB*, 253 F.3d 125, 131-32 (D.C. Cir. 2001), such language within a specific contractual provision does not necessarily establish that the Union bargained away its rights. The Board's precedent has plainly and consistently distinguished between language that states a particular provision applies "during" the contract term, and language that states the relevant benefit will "terminate" at the end of the contract term. Only where the provision states that the benefit will "terminate" has the Board found a clear and unmistakable waiver.

In *Cauthorne Trucking*, the intra-provision language explicitly stated that all employer obligations under the pension agreement would "terminate" on expiration of the contract. 256 NLRB at 722.[12] The Board determined that this

adopted by the Seventh and First Circuits. *See Dep't of Navy v. Fed. Labor Relations Auth.*, 962 F.2d 48 (D.C. Cir. 1992); *NLRB v. United States Postal Serv.*, 8 F.3d 832 (D.C. Cir. 1993); *Chi. Tribune Co. v. NLRB*, 974 F.2d 933 (7th Cir. 1992); *Bath Marine Draftsmen's Ass'n v. NLRB*, 475 F.3d 14, 25 (1st Cir. 2007). We have not adopted the "contract coverage" standard and neither party has suggested that we now do so.

[12]The relevant provision stated, "It is understood and agreed that at the expiration of any particular collective bargaining agreement by and

language expressed a clear intent to relieve the employer of any obligation to make payments after contract expiration. *Id.*

The Board argues that its position in this case is "consistent" with *Cauthorne Trucking* because, even though the text of the dues-checkoff clauses is not identical to that found in *Cauthorne Trucking*, the parties' intent is nonetheless similarly clear.

**[5]** This argument is not persuasive. First, as a matter of plain interpretation, the contractual language that an obligation will "terminate" on expiration of an agreement is simply not equivalent to contractual language that an obligation "shall be continued" "during" the agreement. The latter says nothing about what happens after the agreement expires. Second, subsequent Board decisions explicitly reject such elision. In a series of cases, the Board has distinguished *Cauthorne Trucking* and established that a clear and unmistakable waiver of the obligation to continue providing benefits requires explicit contract language authorizing an employer to terminate its obligations.

In *KBMS, Inc.*, the Board found that language requiring that contributions be made "as long as a Producer is so obligated pursuant to said collective bargaining agreements" did not meet the standard under *Cauthorne Trucking* because this language did not "deal with the *termination* of the employer's obligation to contribute to the funds." 278 N.L.R.B. 826, 849 (1986) (emphasis omitted and added).[13] Similarly, in *Schmidt-*

---

between the Union and any Company's obligation under this Pension Trust Agreement shall terminate unless, in a new collective bargaining agreement, such obligation shall be continued." *Cauthorne Trucking*, 256 N.L.R.B. at 722.

[13]The Board's attempt to distinguish *KBMS* on the basis that the same trust article explicitly provided that it was not intended to alter the applicable CBA is not persuasive, because the *KBMS* Board specifically found that the text *of the relevant provision* "does not purport to deal with the *termination* of the employer's obligation to contribute to the funds." 278 N.L.R.B. at 849 (emphasis added).

*Tiago Constr. Co.*, 286 N.L.R.B. 342, 366 (1987), the Board found no contractual waiver and adopted the ALJ's finding that the case could be distinguished from *Cauthorne Trucking* because the language requiring that employer contributions to the pension fund be "in accordance with" a Pension Agreement "does not on its face . . . specifically state that Respondent's obligation to contribute to the pension trust fund ends with the expiration of the current collective-bargaining contract."[14] *See also id.* at 345 n.7. In *Natico, Inc.*, 302 N.L.R.B. 668 (1991), the Board again did not find a waiver on the basis of language almost identical to the language in this case. There, the provision stated that the parties agreed that the pension program "will remain in effect *for the term of this agreement*." *Id.* at 684 (emphasis added). The Board adopted the ALJ's finding that "[t]he contractual language does not state that the pension program will *terminate* on the expiration of the contract. It appears that language to that effect is required either in the collective-bargaining agreement or in the underlying pension agreement to satisfy a waiver condition." *Id.* at 685 (emphasis added).

**[6]** Further, the Board has refused to infer termination when the provisions at issue have included language that extends benefits for a specified period beyond the term or duration of the contract. In *NLRB v. General Tire and Rubber Co.*, 795 F.2d 585, 588 (6th Cir. 1986) (per curiam) (enforcing *Gen. Tire*, 274 N.L.R.B. at 592-93), the court affirmed the Board's position that where a provision allowed for "the benefits . . . [to be] provided for ninety (90) days following termination," such language could not be understood as a clear and mistakable waiver with respect to the continuation of benefits beyond the ninety-day period. The Board found that the rele-

---

[14]The Board also attempts to distinguish *Schmidt-Tiago* as falling short of a clear and unmistakable waiver on the basis that the relevant analysis continued, "[m]oreover . . ." and listed additional reasons that the waiver was not clear and unmistakable. The import of *Schmidt-Tiago* here, however, is how the durational language was treated.

vant provision "is silent on the matter of payment of benefits *following* the ninety-day period." *Id.* (emphasis added). In other words, far from drawing the inference that after ninety days the benefits would be terminated, the Board found that the provision could stand only for the proposition that "the company would provide an additional ninety days of coverage beyond the expiration of the agreement." *Id.*; *see also Gen. Tire*, 274 N.L.R.B. at 593 ("Nowhere in this contract provision is there mention of what is to occur to these supplemental benefits after the 90 days have expired. In these circumstances, we find no clear and unmistakable waiver of the right to bargain over these supplemental benefits after the 90-day period.").

**[7]** In light of the text of the Agreements' durational provisions and the Board's clear and consistent position on similar provisions, the Board's interpretation of the Agreements here does not withstand *de novo* review. The dues-checkoff provisions do not state that checkoff will terminate on expiration of the Agreements, and the Board's own precedent demonstrates that it has refused to infer such termination—even where those provisions purport to continue benefits only for a limited period of time following the contract expiration. The durational clauses here simply do not amount to a clear and unmistakable waiver of the Union's statutory rights.

## IV.   Conclusion

The Union did not clearly and unmistakably waive its claim to protection from unilateral change following the expiration of the Agreements. We therefore grant the petition for review, vacate the decision of the Board, and remand. Although there is little doubt that the Board's delay in issuing a decision in this case is—as the Union vigorously charged—"deplorable," we do not agree that such a delay precludes a remand for further proceedings. "It is well established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State*

*Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983); *see also Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998) (citing *SEC v. Chenery Corp.*, 318 U.S. 80 (1943)). Moreover, with the "clear and unmistakable" escape hatch closed, the question squarely in front of the Board is whether dues-checkoff in right-to-work states is subject to unilateral change, or whether, under such circumstances, dues-checkoff is a mandatory subject of bargaining. The Board is the appropriate body for developing and applying national labor policy and it should resolve such questions in the first instance.

We again instruct the Board to explain the rule it adopted in *Hacienda I*, or abandon *Hacienda I* to adopt a different rule and present a reasoned explanation to support it. The Union's petition for review is granted, the decision of the Board is vacated, and the matter is remanded to the Board.

PETITION     GRANTED;     DECISION     VACATED; REMANDED with instructions.