**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LOCAL JOINT EXECUTIVE BOARD OF
LAS VEGAS; CULINARY WORKERS
UNION LOCAL #226; BARTENDERS
UNION LOCAL 165,
               *Petitioners,*

      v.

NATIONAL LABOR RELATIONS
BOARD,
               *Respondent.*

No. 10-72981

NLRB Nos.
28-CA-13274/75

OPINION

On Petition for Review of an Order of the
National Labor Relations Board

Argued and Submitted
June 7, 2011—Portland, Oregon

Filed September 13, 2011

Before: William C. Canby, Jr., Susan P. Graber, and
Richard A. Paez, Circuit Judges.

Opinion by Judge Paez

## COUNSEL

Richard G. McCracken, Andrew J. Kahn, and Barry J. Jellison, Davis, Cowell & Bowe LLP, San Francisco, California, for petitioners Local Joint Executive Board of Las Vegas, Culinary Workers Union Local 226 and Bartenders Union Local 165.

Usha Dheenan and Greg P. Lauro, National Labor Relations Board, Washington, D.C., for respondent National Labor Relations Board.

## OPINION

PAEZ, Circuit Judge:

We review a petition by the Local Joint Executive Board of Las Vegas, Culinary Workers Union Local 226 and Bartenders Union Local 165 (the "Union") from an order of the National Labor Relations Board ("NLRB" or the "Board") dismissing a complaint alleging unfair labor practices by Hacienda Resort Hotel and Casino and Sahara Hotel and Casino (the "Employers"). This dispute between the Union and the Employers is now more than 15 years old, and this is the third petition brought by the Union challenging a ruling by the Board. The Union alleges that the Employers violated sec-

tions 8(a)(1) and 8(a)(5) of the National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 151-169, when the Employers unilaterally terminated union dues-checkoff before bargaining to agreement or impasse.

On remand from this court for the second time, the Board deadlocked on the merits with one of five members recused. *Hacienda Hotel, Inc. Gaming Corp.* (*Hacienda III*), ___ N.L.R.B. ___, 355 NLRB No. 154, 2010 WL 3446120, at *1 (Aug. 27, 2010). Unable to form a majority in support of a different rule, the Board followed its prior rulings in *Bethlehem Steel Co.*, 136 N.L.R.B. 1500 (1962), and *Tampa Sheet Metal Co.*, 288 N.L.R.B. 322 (1988), in concluding that termination of dues-checkoff is an exception to the rule articulated in *NLRB v. Katz*, 369 U.S. 736 (1962), that unilateral changes to mandatory subjects of bargaining violate the duty to bargain collectively under the NLRA. *Hacienda III*, 2010 WL 3446120, at *1. The Board affirmed the ruling of an administrative law judge (ALJ) dismissing the Union's complaint.

We have jurisdiction under 29 U.S.C. § 160(f) to review the Board's ruling. As we explain below, we conclude that the Board's decision in *Hacienda III* is arbitrary and capricious because the Board provides no explanation for the rule it follows in dismissing the Union's complaint. We further conclude that, although we must show deference to the Board in its promulgation of labor policy, a third open remand is inappropriate in this case because the Board, after more than fifteen years, has reached a deadlock on the merits and continues to be unable to form a reasoned analysis in support of its ruling. Last, upon consideration of the merits, we conclude that the Employers violated section 8(a)(5) of the NLRA when they unilaterally ceased dues-checkoff before bargaining to impasse. We therefore grant the Union's petition, vacate the Board's ruling, and remand to the Board so that it can determine what relief is appropriate in light of our opinion.

## I.  Background

The Employers operate resorts and casinos in the state of Nevada. The Union maintained collective bargaining relationships with the Employers for more than thirty years, and each union had a substantially identical collective bargaining agreement ("CBA") in place with the Employers. Nevada is a "right-to-work" state where union security clauses conditioning employment upon membership in a union are prohibited. Nev. Rev. Stat. § 613.250;[1] *see also* 29 U.S.C. § 164(b) (providing that federal law does not authorize union security provisions in right-to-work states). Although the CBAs between the Union and the Employers therefore did not include a union security clause, the Union successfully negotiated for automatic union membership dues deductions from employees's wages, or "dues-checkoff."

Under the dues-checkoff provision, the Employers, upon written authorization by a union-member employee, were required to deduct union dues automatically from the worker's paycheck and submit that amount directly to the Union.[2]

[1]Nev. Rev. Stat. § 613.250 reads in full:

"No person shall be denied the opportunity to obtain or retain employment because of nonmembership in a labor organization, nor shall the State, or any subdivision thereof or any corporation, individual or association of any kind enter into any agreement, written or oral, which excludes any person from employment or continuation of employment because of nonmembership in a labor organization."

[2]The dues checkoff provision reads:

3.03. Check-Off

The Check-Off Agreement and system heretofore entered into and established by the Employer and the Union for the check-off of Union dues by voluntary authorization, as set forth in Exhibit 2, attached to and made part of this Agreement, shall be continued in effect for the term of the Agreement.

Exhibit 2 reads:

Thus, although the Union could not require that all workers become dues-paying members of the Union because of Nevada's right-to-work law, it was guaranteed timely, accurate payment of dues by the workers who chose to join the Union and authorize a checkoff. The dues-checkoff provision also benefitted participating employees, who did not incur the cost and effort of submitting dues to the Union themselves.

The CBAs expired in May 1994, and the parties unsuccessfully negotiated for new agreements through the end of 1994. Despite the expiration of the CBAs, the Employers initially continued to deduct union dues from workers' paychecks under the dues-checkoff clause in the expired CBAs. In June 1995, however, the Employers informed the Union that they intended to cease checking off dues, and they in fact stopped deducting dues from employees' paychecks shortly thereafter.

## A.  *Hacienda I* and *LJEB I*

In response to the Employers' unilateral cessation of dues-checkoffs, the Union filed unfair labor practice charges against the Employers. The Union alleged that the Employers' cessation of dues-checkoffs violated the unilateral change doctrine affirmed by the Supreme Court in *Katz*. Under that doctrine, "an employer's unilateral change in conditions of employment under negotiation is . . . a violation of § 8(a)(5) [of the NLRA], for it is a circumvention of the duty to negotiate which frustrates the objectives of § 8(a)(5) much as does flat refusal." *Katz*, 369 U.S. at 743.

General Counsel for the NLRB consolidated the charges

---

Pursuant to the Union Security provision of the Agreement . . . the Employer, during the term of the agreement, agrees to deduct each month Union membership dues . . . from the pay of those employees who have authorized such deductions in writing as provided in this Check-Off Agreement.

and issued complaints against the Employers. An ALJ dismissed the complaints. Upon review of the ALJ's decision, the NLRB affirmed the dismissal in a 3-2 decision,[3] relying on the "well-established precedent [of *Bethlehem Steel* and its progeny] that an employer's obligation to continue a dues-checkoff arrangement expires with the contract that created the obligation." *Hacienda Hotel, Inc. Gaming Corp.* (*Hacienda I*), 331 N.L.R.B. 665, 666 (2000).[4] The Board ruled that, although this line of precedent "initially developed in the context of a contract containing both union security and dues checkoff, it has clearly come to stand for the general rule that an employer's dues-checkoff obligation terminates at contract expiration." *Id.* at 667. The Board ruled that the exception to the unilateral change doctrine first stated in *Bethlehem Steel* had been applied in a right-to-work context in *Tampa Sheet Metal*, 288 N.L.R.B. 322, and this extension of the exception to contracts not involving union security had been relied on in numerous Board decisions. *Hacienda I*, 331 N.L.R.B. at 668-69.

The Union filed a petition for review of the Board's decision with this court, and we granted the petition, vacated the Board's ruling, and remanded for further proceedings. *Local Joint Exec. Bd. of Las Vegas v. NLRB* (*LJEB I*), 309 F.3d 578, 580 (9th Cir. 2002). We explained that "[w]e are unable to discern the Board's rationale for excluding dues-checkoff from the unilateral change doctrine in the absence of union security." *Id*. at 582. We rejected as inadequate the Board's

---

[3]The full board participated in the decision. Chairman Truesdale and Members Hurtgen and Brame were in the majority. Members Liebman and Fox dissented.

[4]In *Bethlehem Steel*, the Board held that a union security clause making union membership a condition of employment was lawful only under a contract complying with § 8(a)(3) of the NLRA, and therefore could not remain effective after the expiration of that contract. 136 N.L.R.B. at 1502. The Board also held that a checkoff provision, mandatory in that instance, was subject to "similar considerations" because it "implemented the union-security provisions." *Id.*

conclusion that the rule of *Bethlehem Steel*, a case concerning dues-checkoff in the context of a union security agreement, was equally valid in right-to-work states merely because such a rule had been assumed without explanation in *Tampa Sheet Metal* and was subsequently repeated in several prior NLRB decisions. *Id.* We remanded the case "so that the Board c[ould] either articulate a reasoned explanation for its rule or adopt a different rule with a reasoned explanation to support it." *Id.*

## B.   *Hacienda II* and *LJEB II*

On remand, the Board abandoned its reliance on *Bethlehem Steel* but again affirmed the ALJ's dismissal, in another split decision, on the ground that the CBAs contained an express waiver of the right to continued dues-checkoff past the expiration of the CBA. *Hacienda Hotel, Inc. Gaming Corp.* (*Hacienda II*), 351 N.L.R.B. 504, 505 (2007).[5] The Union petitioned for review and we concluded that there was "simply no clear and unmistakable waiver." *Local Joint Exec. Bd. of Las Vegas v. NLRB* (*LJEB II*), 540 F.3d 1072, 1075 (9th Cir. 2008). We granted the Union's petition, vacated the Board's decision, and remanded the case to the Board for a second time. *Id.* Noting that "[t]he Board is the appropriate body for developing and applying national labor policy," we directed the Board to either "explain the rule it adopted in *Hacienda I*, or abandon *Hacienda I* to adopt a different rule and present a reasoned explanation to support it." *Id.* at 1082. We explained that "the question squarely in front of the Board is whether dues-checkoff in right-to-work states is subject to unilateral change, or whether, under such circumstances, dues-checkoff is a mandatory subject of bargaining." *Id.*

---

[5]The full board participated in the second decision as well. Chairman Battista and Members Schaumber and Kirsanow were in the majority. Members Liebman and Walsh dissented.

## C.  *Hacienda III*

On the second remand, the Board deadlocked on the merits of the Union's claim. *Hacienda III*, 2010 WL 3446120, at *1. Two members of the Board, Liebman and Pearce, voted in favor of overturning the Board's rule in *Bethlehem Steel* and argued that the Hotel had engaged in an unfair labor practice. *Id*. at *2 (Liebman & Pearce, concurring). Two other members, Schaumber and Hayes, voted in favor of upholding the ALJ's decision and dismissing the Union's complaints. *Id*. at *6 (Schaumber & Hayes, concurring). Member Becker recused himself, a decision that we are not called on to review.

Despite their split on the merits, the Board unanimously agreed that existing NLRB precedent established in *Bethlehem Steel* and *Tampa Sheet Metal* compelled the conclusion that the Employers did not violate the NLRA by unilaterally ceasing dues-checkoff. *Hacienda III*, 2010 WL 3446120, at *1. The Board also unanimously agreed that Board tradition required a three-member majority to overrule existing precedent. *Id*. at *3, 6. Purportedly following its precedent and tradition, the Board therefore dismissed the Union's complaint. *Id*. at *1.

The Union again petitioned for review of the Board's ruling.

## II.  **Standard of Review**

The unilateral change doctrine—and the exclusion of dues-checkoff from that doctrine under *Bethlehem Steel*—"represent[s] the Board's interpretation of the NLRA requirement that parties bargain in good faith." *Litton Fin. Printing Div., Inc. v. NLRB*, 501 U.S. 190, 200 (1991). Under the Administrative Procedure Act, we may hold unlawful and set aside only "agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or other-

wise not in accordance with law." 5 U.S.C. § 706(2)(A). Under *Chevron USA, Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984), we defer to the Board's interpretation of the NLRA if its interpretation is rational and consistent with the Act. *United Food & Commercial Workers Union, Local 1036 v. NLRB*, 307 F.3d 760, 766 (9th Cir. 2002) (en banc). "Where the statute is ambiguous, *Chevron* dictates that 'a court may not substitute its own construction of [the] statutory provision for a reasonable interpretation made by . . . an agency.' " *Id.* at 767 (alteration in original) (quoting *Chevron*, 467 U.S. at 844). We may ignore the views of the Board only where the intent of Congress is clear on the face of the statute. *Id.*

We also review the Board's decision-making process, and "[i]t is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983). We therefore defer to a rule adopted by the Board only if its " 'explication is not inadequate, irrational or arbitrary.' " *Allentown Mack Sales & Serv. v. NLRB*, 522 U.S. 359, 364 (1998) (quoting *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 236 (1963)).

### III.   Discussion

In *LJEB I*, we vacated the Board's order in *Hacienda I* because we were not able to discern the Board's rationale for the exclusion of dues-checkoff from the unilateral change doctrine in the absence of a union security agreement. 309 F.3d at 585. We concluded that nothing in *Bethlehem Steel* or *Tampa Sheet Metal* provided a reasoned explanation for such a rule. *Id.* On this point, the four voting members of the Board who participated in *Hacienda III* agree. *See Hacienda III*, 2010 WL 3446120, at *2 (Liebman & Pearce, concurring) ("[T]he Board has never provided a reasoned analysis for applying the holding in *Bethlehem Steel* in a right-to-work context where dues checkoff could not lawfully be linked

with union-security arrangements."); *id.* at *6 (Schaumber & Hayes, concurring) (conceding that "we may have failed to adequately explain previously" the reasons for the rule of *Bethlehem Steel* and *Tampa Sheet Metal*).**[6]**

*Hacienda III*, however, does not respond to our direction that the Board either offer a reasoned explanation for its rule or abandon it. Instead, the Board perfunctorily ruled that the dismissal of the Union's complaint "was compelled by [its] decisions in *Bethlehem Steel . . .* and *Tampa Sheet Metal*." *Hacienda III*, 2010 WL 3446120, at *1. The Board characterized its conclusory ruling as "follow[ing] existing precedent." *Id.* at *2.

## A. The Board's ruling in *Hacienda III* is arbitrary and capricious

**[1]** The Board's most recent ruling in Hacienda III rests on essentially the same reasoning it provided in *Hacienda I.* Namely, the Board insists that the exception to the unilateral change doctrine for dues-checkoff, even in right-to-work states, is the rule the Board must follow in this case simply because it is the rule that the Board has followed in the past. We rejected this very reasoning in *LJEB I*, 309 F.3d at 583, and we reject it again here. As we have explained, "Although a Board rule may become 'well-established' through repetition, it may 'come to stand for' a legal rule only through rea-

---

**[6]**The Seventh Circuit criticized our conclusion in *LJEB I*, stating that it had "no similar problem understanding the basis of the Board's rule." *Office & Prof'l Emps. Int'l Union v. Wood Cnty. Tel. Co.*, 408 F.3d 314, 317 (7th Cir. 2005). The Seventh Circuit, however, mischaracterized our opinion in *LJEB I* as holding "that the rule of [*Katz*] . . . applies to dues checkoffs as well as wages and fringe benefits." *Id*. First, in *LJEB I*, we expressly *declined* to adopt any such broad rule out of deference to the NLRB. 309 F.3d at 585. Second, our ruling rested on the Board's failure to distinguish between dues-checkoff in the context of a union security agreement and dues-checkoff in a right-to-work state, *id.* at 585-86, a consideration wholly absent in the Seventh Circuit's analysis.

soned decisionmaking." *Id.* (quoting *Allentown Mack*, 522 U.S. at 374).

**[2]** We also reject the Board's attempt to veil its familiar argument in procedural formalities. The Board asks us to leave its ruling in place out of deference to an NLRB tradition that requires a three-member majority to overturn existing precedent. The Board cites *Vermont Yankee Nuclear Power Corp. v. Natural Resource Defense Council, Inc.*, 435 U.S. 519 (1978), and *FCC v. Pottsville Broadcasting Co.*, 309 U.S. 134 (1940), in support of its argument that agencies are entitled to independence and deference in developing their procedures. In *Pottsville*, the Supreme Court ruled that agencies "should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties." 309 U.S. at 143. In *Vermont Yankee*, the Court reaffirmed that "the formulation of procedures [is] basically to be left within the discretion of the agencies to which Congress had confided the responsibility for substantive judgments." 435 U.S. at 524. We agree that we generally must defer to the Board's choice of particular procedures that it has decided are best suited to the adjudication of labor disputes, but this deference does not free the Board to ignore our mandate to explain the rule it chooses to adopt.

**[3]** The question presented here is not whether the NLRB's chosen procedures are adequate, but rather whether the explication of its ruling is adequate. *See LJEB I*, 309 F.3d at 583 (citing *NLRB v. Erie Resistor Corp.*, 373 U.S. at 236). *Pottsville* and *Vermont Yankee* do not hold that the Board's adherence to its traditional practices eliminates the Board's responsibility to provide an adequate, rational, non-arbitrary rule that is consistent with the NLRA. The fact that the Board offers only a procedural justification for its substantive ruling only highlights that the ruling is substantively arbitrary. We will not defer to an agency's procedures or traditional practices when they result in arbitrary substantive rules.

We recognize the Board's interest in protecting the stability of its legal precedent. Unlike other federal agencies, the NLRB promulgates nearly all of its legal rules through adjudication rather than rulemaking. *Allentown Mack*, 522 U.S. at 374. Under such a scheme, the Board's rules would be of little assistance to employers and unions in following the NLRA if the Board's rules interpreting the Act were subject to routine, frequent change. The Board reasonably has decided that requiring a three-member majority to overturn precedent provides for the necessary stability of its rules, and we defer to that judgment.

**[4]** Reasoned decisionmaking, however, is paramount to consistent decisionmaking. Where the Board breaches its duty to provide any rational and logical explanation for its rules, "the consistent repetition of that breach can hardly mend it." *Id.* In their concurrence to *Hacienda III*, Members Shaumber and Hayes argue that abandoning the rule of *Bethlehem Steel* and *Tampa Sheet Metal* "would have a destabilizing impact on bargaining relationships" because "[t]he rule is well-known, well-understood, and practitioners have relied upon it in doing business on behalf of their clients." 2010 WL 3446120 at *8. A pattern of obedience to an arbitrary rule, however, does not by itself support the rule's continued application. Our responsibility is to ensure that the Board's rules are consistent with the NLRA. Stability in labor relations must arise from reasoned rules promulgated by the Board, not from our willful ignorance of the Board's arbitrary decisionmaking in an effort to avoid rocking the boat.

**[5]** We conclude, as we did in *Hacienda I*, that the Board has yet to provide a reasoned explanation for its rule excluding dues-checkoff from the unilateral change doctrine in right-to-work states. The Board's purported adherence to its procedural rules does nothing to correct this inadequacy, and we therefore vacate the ruling in *Hacienda III* as arbitrary and capricious.

## B.   Judicial interpretation of the NLRA

**[6]** Next, we must decide how we should proceed, taking into account that this controversy is more than fifteen years old and that the Board is deadlocked on the merits. Were we to remand this case with the same instructions that we have given to the Board twice before, it would likely mean that a case long overdue for a final decision on the merits would continue to remain without one. Without a change in the composition of the Board,[7] the Board will continue to be unable to form a majority that can provide a reasoned explanation for a rule either extending or limiting a dues-checkoff exception in right-to-work states.

Despite these concerns, we also remain mindful of the deference due the NLRB. The Board "has the primary responsibility for developing and applying national labor policy." *NLRB v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, 786 (1990). Indeed, the Supreme Court has cautioned:

> If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, *except in rare circumstances*, is to remand to the agency for additional investigation or explanation. The reviewing court is not generally empowered to conduct a de novo inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry.

---

[7]Currently the NLRB is composed of three members: Mark G. Pearce, Chair; Craig Becker; and Brian Hayes. Member Becker is serving a recess appointment; if the Senate does not act on his renomination, his term will expire when the Senate adjourns later this year. There is a pending nomination for Terence F. Flynn and one open seat for which no person has been nominated. *See NLRB, The Board*, https://www.nlrb.gov/who-we-are/board (last visited Sept. 2, 2011).

*Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) (emphasis added). The court of appeals' role is thus normally limited to evaluating whether the Board's rules are rational and consistent with the Act. *See United Food & Commercial Workers Union*, 307 F.3d at 766.

Accordingly, only in rare circumstances will we address the merits of a case where the agency has failed to do so. *See Earth Island Inst. v. Hogarth*, 494 F.3d 757 (9th Cir. 2007) (vacating a finding of "no adverse impact" by the National Oceanic and Atmospheric Administration ("NOAA") where the agency had failed twice to perform statutorily-required environmental studies); *Sierra Club v. EPA*, 346 F.3d 955 (9th Cir. 2003) (vacating an order by the Environmental Protection Agency and ordering a specific finding where the administrative record was fully developed and conclusions following from the record were clear); *Ariz. Electric Power Coop., Inc. v. United States*, 816 F.2d 1366, 1376 (9th Cir. 1987) (vacating a decision of the Interstate Commerce Commission ("ICC") and remanding with specific instructions "[b]ecause of the history of recalcitrance displayed by the ICC").

Our cases directing agency action have often responded to an agency's stubborn refusal to follow our mandate or statutory provisions. For instance, in *Earth Island*, we vacated an environmental finding by the NOAA rather than remand for further study because of the agency's "intransigence" in twice failing to conduct statutorily required studies. 494 F.3d at 770. Similarly, in *Arizona Electric Power Cooperative*, we ordered the ICC to review power rates under Coal Rate Guidelines when the agency's prior refusal to do so demonstrated a "history of recalcitrance" including the ICC's failure to abide by representations the agency made to this court and reliance on a mistaken interpretation of applicable statutes. 816 F.2d at 1376. While we cannot say that the NLRB has been guilty of similar practices in this case, the Board's inability to resolve the issue repeatedly presented to it and its failure to produce

a reasoned ruling is no less frustrating to the timely, final dis-
position of the dispute between the Employers and the Union.

**[7]** Weighing the Board's consistent failure to provide a
reasoned disposition against the deference we owe the NLRB
in dictating labor policy, we conclude that this case presents
the "rare circumstance" in which another remand would be
inappropriate. *Fla. Power & Light*, 470 U.S. at 744. The
Board conceded at oral argument that we can only speculate
whether the Board would be able to break its deadlock and
reach a different decision were we to remand the case for a
third time. Therefore, given the amount of time that this case
has been pending before the Board and the Board's continued
inability to provide a rational justification for the rule it pro-
poses, we are convinced that a third remand would be futile,
or at least that the likelihood of continued deadlock outweighs
the speculative benefit of providing the Board with one more
opportunity to comply with our prior orders.

**[8]** We therefore turn finally to the question we put to the
Board in *LJEB II*, namely, "whether dues-checkoff in right-to-
work states is subject to unilateral change, or whether, under
such circumstances, dues-checkoff is a mandatory subject of
bargaining." 540 F.3d at 1082. We note first that section
8(a)(5) of the NLRA, providing that it is an unfair labor prac-
tice for an employer to refuse to bargain collectively with a
union, is silent regarding the treatment of dues-checkoff in
right-to-work states after the expiration of a CBA. Section
8(d), governing the obligation to bargain collectively "in good
faith with respect to wages, hours, and other terms and condi-
tions of employment" is also silent as to dues-checkoff. The
text of the statute is therefore ambiguous regarding whether
dues-checkoff is a mandatory subject of bargaining in right-
to-work states.

**[9]** As we have said, when a statute is ambiguous, we may
not substitute our own interpretation of the statute for that of
the Board. *See United Food & Commercial Workers Union*,

307 F.3d at 767. Therefore, had the Board provided a reasoned analysis for a rule excluding dues-checkoff from the unilateral change doctrine in the absence of union security, we would be required to defer to that rule so long as it was rational and consistent with the NLRA. *Id.* Because the Board was unable to provide a reasoned explanation for the rule, however, we are forced to interpret the statute as if the Board had not spoken at all.[8]

**[10]** In comparing this case to the facts of *Bethlehem Steel*, we conclude that there is no justification for carving out an exception to the unilateral change doctrine for dues-checkoff in the absence of union security. The Supreme Court has long recognized that automatic dues-checkoff is a powerful tool under a union security agreement for a union to combat the problem of " 'free riders,' i.e., employees who receive the benefits of union representation but are unwilling to contribute their fair share of financial support to such union." *NLRB v. Gen. Motors Corp.*, 373 U.S. 734, 742-43 (1963). Where a union security agreement is present, as in *Bethlehem Steel*, automatic dues-checkoff is forced upon all employees whether they wish to be part of the union or not. This arrangement serves to keep a union funded even though individual workers might otherwise choose to enjoy the benefits of a union-negotiated CBA without paying union dues. In a right-to-work state, on the other hand, dues are deducted from an employee's paycheck only if the employee specifically requests the employer to do so. Dues-checkoff is thus not a

---

[8]We recognize that even if an agency has not formally interpreted a statute, the agency's interpretation may merit some deference whatever its form, in light of the " 'specialized experience and broader investigations and information' available to the agency." *United States v. Mead Corp.*, 533 U.S. 218, 234 (2001) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 139 (1944)). Counsel for the NLRB stated at oral argument, however, that neither of the concurrences to *Hacienda III* represent the view of the Board, which is limited to the procedural justification we discussed above in Section III(A). There is thus *no* substantive position to which we must, or even may, defer.

benefit to the union forced upon employees, but rather is a benefit to those employees who choose to be part of the union and also choose a checkoff.

**[11]** This distinction is crucial. In *Bethlehem Steel*, the dues-checkoff arrangement was compelled under the terms of the CBA just as the employees' membership in the union had been compelled pursuant to the union security agreement in the CBA. In this case, however, union membership was not a condition of employment, and each employee whose dues were being checked off signed a request that the Employers deduct dues from their pay and submit the dues to the Union. Thus, unlike in *Bethlehem Steel*, where the unilateral cessation of dues-checkoff merely terminated a contractual arrangement that individual employees and employers alike were compelled to accept, the unilateral cessation of checkoff by the Employers in this case stripped employees of a contractual right that they had expressly exercised by requesting dues-checkoff.

Without expressing an opinion on the wisdom of the rule of *Bethlehem Steel*, we see why the Board would treat dues-checkoff in the same manner as union security where both are present. As the Board has stated, "[t]he exception . . . permitting unilateral abandonment of union-security and checkoff arrangements after contract expiration is based on the fact, noted in *Bethlehem Steel*, that '[t]he acquisition and maintenance of union membership cannot be made a condition of employment except under a contract which conforms to the [NLRA].' " *Ind. & Mich. Electric Co.*, 284 N.L.R.B. 53, 55 (1987) (quoting *Bethlehem Steel*, 136 N.L.R.B. at 1502). In other words, if union security provisions are limited by statute to the duration of an existing CBA, dues-checkoff provisions that "implement[ ] the union-security provisions" are limited in the same manner. *Bethlehem Steel*, 136 N.L.R.B. at 1502.

**[12]** Where the dues-checkoff provisions do not implement union security, however, but instead exist as a free-standing,

independent convenience to willingly participating employees, the reasoning of *Bethlehem Steel* loses its force. We see nothing in the NLRA that limits the duration of dues-checkoffs to the duration of a CBA in the absence of union security. Moreover, other statutory provisions suggest the opposite. For instance, the Labor-Management Relations Act provides that "a written assignment [for dues-checkoff] shall not be irrevocable . . . beyond the termination date of the applicable collective agreement." 29 U.S.C. § 186(c)(4). This provision would be surplusage if Congress believed that dues-checkoff automatically terminated upon the expiration of a CBA. *See Nw. Forest Res. v. Glickman*, 82 F. 3d 825, 834 (9th Cir. 1996) ("We have long followed the principle that '[s]tatutes should not be construed to make surplusage of any provision.' ") (citation omitted).

**[13]** Accordingly, we conclude that in a right-to-work state, where dues-checkoff does not exist to implement union security, dues-checkoff is akin to any other term of employment that is a mandatory subject of bargaining. Because each affected employee individually requested dues-checkoff, the Employers' actions in this case were an unlawful termination of a bargained benefit to employees, not merely the cessation of a provision that automatically terminated along with the CBA and union security. The Employers' unilateral termination of dues-checkoff in this case was thus "in effect a refusal to negotiate . . . which reflect[ed] a cast of mind against reaching agreement." *Katz*, 369 U.S. at 747. In ceasing dues-checkoff without bargaining to impasse, the Employers therefore violated section 8(a)(5) of the NLRA.

## IV.   Conclusion

**[14]** In light of this violation, we remand to the Board to determine what relief is warranted. We stress that, because the NLRA is ambiguous on this issue, the Board may adopt a different rule in the future provided, of course, that such a rule is rational and consistent with the NLRA. *See Nat'l Cable &*

*Telecom. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982-83 (2005) ("Only a judicial precedent holding that the statute unambiguously forecloses the agency's interpretation, and therefore contains no gap for the agency to fill, displaces a conflicting agency construction."); *see also N. Cal. River Watch v. Wilcox*, 633 F.3d 766, 781 (9th Cir. 2011) (interpreting an ambiguous provision of the Endangered Species Act, but recognizing that the Forest and Wildlife Service could adopt a different rule in the future). With regard to *this* case, however, the Board has three times failed to provide a workable rule, and the parties cannot be expected to wait any longer.

PETITION GRANTED, and REMANDED.

Costs on appeal awarded to Petitioners.