**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PRUDENTIAL LOCATIONS LLC, a
Hawaii limited liability company,
*Plaintiff-Appellant,*

v.

U. S. DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT,
*Defendant-Appellee.*

No. 09-16995

D.C. No.
1:09-cv-00128-
SOM-KSC

OPINION

Appeal from the United States District Court
for the District of Hawai'i
Susan Oki Mollway, Chief District Judge, Presiding

Argued and Submitted
February 15, 2011—Honolulu, Hawaii

Filed June 9, 2011

Before: A. Wallace Tashima, William A. Fletcher, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Berzon

## COUNSEL

Paul Alston and Jason H. Kim, Alston Hunt Floyd & Ing, Honolulu, Hawaii, for the plaintiff-appellant.

Tony West, Assistant Attorney General, Steve Frank and Leonard Schaitman, Attorneys, U.S. Department of Justice, Civil Division, Washington, D.C., and Edward H. Kubo, Jr., United States Attorney, Honolulu, Hawaii, for the defendant-appellee.

## OPINION

BERZON, Circuit Judge:

This is a Freedom of Information Act ("FOIA") case concerning a request for documents about individuals who reported to the U.S. Department of Housing and Urban Development ("HUD") their suspicions that Prudential Locations LLC ("Prudential"), a real estate company, was violating the law. HUD produced the documents, but redacted the two of them at issue here to conceal information that identified the complaining individuals. In defense of the redactions, HUD asserted, and the district court agreed, that the redactions were justified pursuant to FOIA Exemption 6, which allows an agency to withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6); *see Prudential Locations LLC v. HUD*, 646 F. Supp. 2d 1221, 1228 (D. Haw. 2009).

Under the case law, Exemption 6 requires courts to balance the personal privacy interests protected by the exemption against the public interest furthered by disclosure. *See Lahr v. Nat'l Transp. Safety Bd.*, 569 F.3d 964, 973 (9th Cir. 2009). That inquiry requires assessing the magnitude of the privacy

interests at stake and the severity of the invasion of those interests that would be occasioned by disclosure. Here, we are faced with an additional, different question: How *likely* is it that disclosure would result in any privacy invasion at all? We remand because HUD has not provided a factual basis sufficient to answer any of those three questions. *See Fiduccia v. U.S. Dep't of Justice*, 185 F.3d 1035, 1040 (9th Cir. 1999); *Wiener v. FBI*, 943 F.2d 972, 979 (9th Cir. 1991). In light of the FOIA's strong presumption in favor of disclosure, and the narrow reach of the FOIA exemptions, *see, e.g.*, *Milner v. Dep't of Navy*, 131 S. Ct. 1259, 1265 (2011), we cannot affirm the grant of summary judgment on the current record. While HUD has conjured the specter of privacy interests, it has not adduced evidence establishing such interests are actually at stake, or if they are, how much weight they should be accorded.

I

HUD is responsible for administering and enforcing the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601-2617. One of the purposes of RESPA is to "eliminat[e] . . . kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services." 12 U.S.C. § 2601(b)(2). To achieve that purpose, the act prohibits, among other things, giving or accepting "fee[s], kickback[s] or thing[s] of value" for referring "business incident to or a part of a real estate settlement service involving a federally related mortgage loan." *Id.* § 2607(a). The documents at issue here are two communications notifying HUD of suspected violations of RESPA's prohibitions on kickbacks and referral fees.

The first document is a short letter dated July 7, 2003 (the "2003 Letter"). The letter averred that "Prudential Locations Real Estate Salespersons get monetary kickbacks ($$,$$$) for the amount of business that is referred to Wells Fargo." Attached to the letter was an article from the Honolulu Star-

Bulletin purportedly supporting the allegations. The informant did not expressly request an investigation, but did ask: "Is it a violation of RESPA for real estate agents to receive compensation for steering business to a specific Lender?" The author of the letter neither requested anonymity nor affirmatively authorized release of his name.

Based on that letter, HUD initiated an investigation into Prudential's business practices, ultimately confirming the informant's allegations. HUD found Prudential had violated RESPA by giving valuable things, including expensive vacation packages and a lease on a Mercedes-Benz, to its salespeople in return for referral of business to Wells Fargo Home Mortgage Hawaii, LLC, a company in which Prudential had a financial interest. After the investigation, Prudential entered into a settlement agreement with HUD in 2005, consenting to a $48,000 penalty and promising not to violate RESPA in the future.

The second document at issue is an email, dated January 19, 2008 (the "2008 Email"), alleging that Prudential was continuing to violate RESPA even after the settlement. The author of the email claimed to know about the continued violations because "an agent from Prudential . . . expressed concern that his company was violating RESPA laws again." The sender urged HUD to "interview [Prudential's] agents [to] confirm there was a direct violation of RESPA again and be very strict on them." Unlike the first complainant, this author specifically requested anonymity in his communication to HUD.

After receiving this email, HUD initiated a second investigation of Prudential. That investigation did not reveal any RESPA violations, and it was closed in March 2009.

In June 2008, while the second investigation was in progress, Prudential filed a FOIA request with HUD, seeking "[d]ocuments sufficient to show the identity of all parties who

provided information to HUD relating to the initiation" of the two investigations. HUD produced about four hundred pages of responsive documents in March 2009.

As part of that bundle, HUD released the 2003 Letter, redacting what appears to be a letterhead and a signature. HUD also produced a redacted copy of the 2008 Email, concealing the information contained in the email's "from" line, the first half of the first sentence of the email, and the signature line. Also redacted was a sentence in the body of the email, leaving it to read: "Please take this action and I can be contacted at [REDACTED] but I would like to remain anonymous [REDACTED]." The first redaction in that sentence looks to be about the length of a phone number or email address, and the second spans approximately 10-12 average-length words.

In a letter accompanying the released documents, HUD relied on FOIA Exemption 6 to justify the redactions, stating that "[r]elease of this information would constitute an unwarranted invasion of personal privacy" and "[t]he interest of the general public in reviewing these portions of government documents does not outweigh the individuals' right to privacy."

Unsatisfied with this response, Prudential filed a complaint in the United States District Court for the District of Hawai'i seeking unredacted copies of the two documents. In reply, HUD supported withholding the information by submitting a declaration from Ivy Jackson, the Director of the Office of RESPA and Interstate Land Sales at HUD. Jackson averred that "[i]t has been the policy of this office to never disclose the identity of a complainant whether or not the complainant affirmatively authorized the release. . . . These industry insiders are potentially vulnerable to retaliation, i.e. loss of employment, loss of business and legal action." She further declared that "when speaking before industry groups I have stated that it is the policy of the office not to disclose the identity of any complainant." Finally, according to Jackson, the

RESPA investigations office has a "consistent policy and practice" of "protect[ing] the identity of persons providing information about possible RESPA violations, unless the person has specifically authorized release of his or her name."

On cross-motions for summary judgment, the district court agreed with HUD that Exemption 6 justified redacting the information, and granted the agency's motion. Prudential appealed.

II

1

We apply a two-step standard of review to summary judgment in FOIA cases. We "first determine[ ] under a *de novo* standard whether an adequate factual basis exists to support the district court's decision[ ]." *Lane v. Dep't of Interior*, 523 F.3d 1128, 1135 (9th Cir. 2008) (citing *Lion Raisins, Inc. v. U.S. Dep't of Agric.*, 354 F.3d 1072, 1078 (9th Cir. 2004)). If the district court did not have an adequate factual basis, we remand. *Fiduccia*, 185 F.3d at 1040. "If an adequate factual basis exists, then the district court's conclusions of fact are reviewed for clear error, while legal rulings, including its decision that a particular exemption applies, are reviewed *de novo*." *Lane*, 523 F.3d at 1135.

2

**[1]** The FOIA is a disclosure statute, enacted to "permit access to official information long shielded unnecessarily from public view." *Milner*, 131 S. Ct. at 1262 (quoting *EPA v. Mink*, 410 U.S. 73, 80 (1973)). Such access to government information helps "ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (citation and quotation marks omitted).

Of course, not all governmental information must be made publicly available; accordingly, the FOIA contains specific discretionary exemptions to its disclosure requirements. *See* 5 U.S.C. § 552(b)(1)-(9); *Elec. Frontier Found. v. Office of the Dir. of Nat'l Intelligence*, ___ F.3d ___, 2010 WL 1407955, at *4 (9th Cir. Apr. 9, 2010) (citing *Lahr*, 569 F.3d at 973). In light of the Act's purpose of encouraging ready access to information, however, "these exemptions are explicitly made exclusive, and must be narrowly construed." *Milner*, 131 S. Ct. at 1262 (citations and quotation marks omitted).

Moreover, "the strong presumption in favor of disclosure places the burden on the agency to justify the withholding of any requested documents." *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991); *Maricopa Audubon Soc'y v. U.S. Forest Serv.*, 108 F.3d 1089, 1092 (9th Cir. 1997). We apply that burden "with an awareness that the plaintiff, who does not have access to the withheld materials, 'is at a distinct disadvantage in attempting to controvert the agency's claims.'" *Maricopa*, 108 F.3d at 1092 (quoting *Ollestad v. Kelley*, 573 F.2d 1109, 1110 (9th Cir. 1978)). It follows, of course, that we cannot take the government at its word when it claims an exemption applies; like all parties on summary judgment, the government must adduce specific evidence to carry its burden. *See* Fed. R. Civ. P. 56(c).

**[2]** Exemption 6, the exemption relied on by HUD, applies to "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Prudential does not dispute that the 2003 Letter and 2008 Email are "similar files" under Exemption 6. We express no view on that question and assume without deciding that the documents qualify. The only issue then is whether disclosing the redacted information "would constitute a clearly unwarranted invasion of personal privacy." *Id*.

**[3]** To answer that question, we must first confirm that some "personal privacy" interest is at stake. *See Church of*

*Scientology of Cal. v. U.S. Dep't of Army*, 611 F.2d 738, 746 (9th Cir. 1979) (recognizing that courts "should first determine if disclosure would constitute an invasion of privacy" (quoting *Rural Hous. Alliance v. U.S. Dep't of Agric.*, 498 F.2d 73, 77 (D.C. Cir. 1974)); *see also Multi Ag Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1229-30 (D.C. Cir. 2008); *Schiffer v. FBI*, 78 F.3d 1405, 1410 (9th Cir. 1996). For instance, releasing intimate information about an individual's "marital and employment status, children, [and] living conditions" no doubt implicates privacy interests protected by Exemption 6 if "linked publicly with particular, named individuals." *Ray*, 502 U.S. at 175-76. In contrast, disclosure of documents threatening merely to tarnish a corporation's reputation would not, as corporations do not have personal privacy interests under the FOIA. *See FCC v. AT & T Inc.*, 131 S. Ct. 1177, 1185 (2011). A " 'nontrivial privacy interest' " can sometimes be sufficient to justify withholding information, *see Forest Serv. Emps. for Envtl. Ethics v. U.S. Forest Serv.*, 524 F.3d 1021, 1026-27 (9th Cir. 2008) (quoting *U.S. Dep't of Def. v. Fed. Labor Relations Auth.*, 510 U.S. 487, 501 (1994)), but if *no* nontrivial privacy interest is implicated, the FOIA demands disclosure. *See Multi Ag Media*, 515 F.3d at 1229-30.

**[4]** If some nontrivial personal privacy interest is at stake, the government can withhold the information only upon a showing that the invasion of privacy would be "clearly unwarranted." 5 U.S.C. § 552(b)(6). That inquiry, ordinarily the meat and potatoes of the Exemption 6 analysis, requires us to "balance the privacy interest protected by the exemption[ ] against the public interest in government openness that would be served by disclosure." *Lahr*, 569 F.3d at 973.

**[5]** Finally, we must assess the *likelihood* that a privacy invasion will occur. We have not articulated a precise standard governing what the government must show in this respect, but a few precepts are apparent: Exemption 6 speaks of disclosure that "*would* constitute a clearly unwarranted

invasion of personal privacy." 5 U.S.C. § 552(b)(6) (emphasis added). At a minimum, and unsurprisingly given the emphatic "would" requirement in the statutory text, the threat to privacy interests must be "more palpable than [a] mere possibilit[y]." *Dep't of Air Force v. Rose*, 425 U.S. 352, 380 n.19 (1976). The government, however, is not required to establish that a privacy invasion is *certain* to occur. Rather, it is enough to show a "substantial probability that the disclosure will lead to" an invasion of privacy. *Painting Indus. of Haw. Mkt. Recovery Fund v. Dep't of Air Force*, 26 F.3d 1479, 1483 (9th Cir. 1994) (quoting *Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 878 (D.C. Cir. 1989)).

The "substantial probability" standard is necessarily quite a high threshold. For one, it is a judicial gloss on the statute's plain text, which requires a showing that making information public "*would* constitute"—rather than "might" or "could" constitute—an invasion of privacy, connoting something nearly certain to occur. Moreover, Exemption 6 has a law enforcement analogue, Exemption 7(C), which allows the government to withhold "records or information compiled for law enforcement purposes" if disclosure "*could reasonably be expected* to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C) (emphasis added). The marked difference in the statutory text of these exemptions indicates that our "substantial probability" gloss on Exemption 6 requires a significantly higher showing that an invasion will occur than the "could reasonably be expected" standard found in Exemption 7(C). *See Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 166 (2004) ("Exemption 7(C)'s . . . breadth [as compared to Exemption 6] is no mere accident in drafting. We know Congress gave special consideration to the language in Exemption 7(C) because it was the result of specific amendments to an existing statute." (citation omitted)); *Hunt v. FBI*, 972 F.2d 286, 287-88 (9th Cir. 1992)

(acknowledging textual differences between exemptions 6 and 7(C)).[1]

With these principles in mind, we turn to the information in dispute here.

3

**[6]** Releasing unredacted versions of the 2003 Letter and the 2008 Email *could*, but only possibly, invade personal privacy interests under Exemption 6. For instance, if the complainants work at Prudential, they could be stigmatized as disloyal employees by management and face retaliation in their employment. They might also be harassed or mistreated by their colleagues. After all, the kick-back scheme uncovered by HUD involved employee benefits—parties, expensive prizes, and exotic vacations—and some co-workers might resent losing such perks in the future. Likewise, the complainants could face retaliation even if they were, but are no longer, employees of Prudential. Disclosure of their whistleblower activities, for example, could affect their ability to obtain positive job references, diminishing their employment prospects. Also, even if the informants now work in non-managerial positions in the same industry as Prudential, they could face some stigma or harassment, as their employers or colleagues might view them as troublemakers or busybodies.

---

[1]The exemptions differ in another way as well: Exemption 7(C) does not require that a privacy invasion be "clearly" unwarranted. That exemption is therefore satisfied upon a lesser showing by the government of the strength of the privacy interests required to override the respective public interest at stake. *See Favish*, 541 U.S. at 165-66; *Lahr*, 569 F.3d at 974. Despite these differences, exemptions 6 and 7(C) require balancing the same privacy and public interest factors, so cases interpreting one exemption can illuminate application of the other. *See Fed. Labor Relations Auth.*, 510 U.S. at 496 n.6. HUD has not invoked Exemption 7(C) in this case, and we express no view on whether it would have been applicable.

**[7]** These examples of possible stigmatization, harassment, and retaliation resulting from cooperation with a governmental investigation would be cognizable personal privacy interests under the Exemption 6 precedents. For instance, in *United States Department of State v. Ray*, the plaintiff sought interviews conducted by the State Department with emigrants who had been involuntarily returned to Haiti by the United States. 502 U.S. at 167. The interviews were part of a program to monitor compliance by the Haitian Government with its assurance that returning Haitians would not be subject to prosecution for illegally departing the country. *Id.* at 167-68. The government produced summaries of the interviews but relied on Exemption 6 to redact the names and other identifying information from the documents. *Id.* at 168-69.

The Supreme Court acknowledged that the emigrants had privacy interests in personal details revealed in the interviews, such as marital and employment status, if those details could be linked to particular individuals. *See id.* at 175-76. More pertinent here, the Court also held that revealing their cooperation with the State Department could subject them to "embarrassment in their social and community relationships." *Id.* at 176 (quotation marks and citation omitted). Further, the interviewees had privacy interests in avoiding "retaliatory action that might result from a renewed interest in their aborted attempts to emigrate." *Id.* at 177.

We have also similarly recognized privacy interests under exemptions 6 and 7(C) even though intimate personal details were not at stake. In *Forest Service Employees*, for example, a watchdog organization requested the release of an agency report regarding an incident in which two firefighters died during a wildfire. 524 F.3d at 1022-23. The fire received significant public attention, and the Forest Service was heavily criticized for creating unsafe working conditions. The agency thereupon generated a report, concluding its "own management failings contributed to the tragedy." *Id.* at 1023. The Forest Service released its report but redacted under Exemp-

tion 6 the names of all twenty-three employees identified therein, some of whom were subject to disciplinary sanctions, and some of whom "merely served as cooperating witnesses" in the investigation. *Id.* at 1023.

We affirmed the application of Exemption 6, holding that the employees had cognizable privacy interests in avoiding the "embarrassment and stigma" that might arise from association with the incident. *Id.* at 1026. We also acknowledged the employees possessed privacy interests in avoiding "harassment" by the plaintiff, who planned to contact them, as well as by the media, which was likely to follow suit given the significant public attention generated by the fire. *Id.*; *see also Lahr*, 569 F.3d at 975-77 (recognizing a privacy interest under Exemption 7(C) implicated by releasing the names of eyewitnesses to an airplane crash, because it would reveal publicly their involvement in the ensuing investigation, and it was likely that the plaintiff and the media would contact them about the incident).

Therefore, if the complainants are or were employed by Prudential, or even if they worked in non-managerial positions in the same industry as Prudential, there might well be a substantial probability that disclosure would lead to an invasion of personal privacy—namely, revealing their whistleblower status could result in stigmatization, harassment, or retaliation.

**[8]** At the same time, the disclosure of names and other identifying information is not "inherently and always a significant threat to the privacy of the [named] individuals." *Ray*, 502 U.S. at 176 n.12. A threat may be "*de minimis*" if disclosure reveals nothing about the individual pertinent to his privacy, and no adverse consequences are likely to ensue. *Id.* (citation omitted). Here, releasing the informants' identifying information might not threaten *any* nontrivial invasion of personal privacy. Even if some cognizable interest is at stake, it

could be substantially less compelling than in the hypothetical scenarios suggested above.

We fail to see, for example, how disclosing the names of managerial employees at an industry competitor of Prudential would infringe personal privacy interests in any nontrivial way. Such individuals would not face an apparent risk of harassment or stigmatization, and because such complaints would have been made primarily for business reasons, any plausible *personal* privacy interests would be nonexistent or seriously diminished.[2] *See Elec. Frontier Found.*, ___ F.3d ___, 2010 WL 1407955, at *10 (holding that the personal privacy interests of industry lobbyists in their employment activities were not weighty, as disclosing their names would "not reveal sensitive personal information" (citation and quotation marks omitted)); *see also Wash. Post Co. v. U.S. Dep't of Justice*, 863 F.2d 96, 100 (D.C. Cir. 1988) ("Information relating to business judgments and relationships does not qualify" as personal privacy interests under Exemption 7(C), "even if disclosure might tarnish someone's professional reputation" (citations omitted)).

Likewise, complainants entirely unaffiliated with Prudential or the real estate industry might have *some* nontrivial privacy interest in not being associated with the investigation, *see Lahr*, 569 F.3d at 974-75; *Schiffer*, 78 F.3d at 1410, but

---

[2]Similarly, it is not unheard of for unscrupulous individuals to accuse a business of legal violations to depress the company's stock price or otherwise gain an advantage in securities trading. *See Medifast, Inc. v. Minkow*, No. 10-CV-382 JLS (BGS), 2011 WL 1157625, at *1 (S.D. Cal. Mar. 29, 2011) (describing an alleged "series of coordinated attacks" on a company, including accusations of regulatory violations, designed "to increase the value of a short position"); *see also* Robbie Whelan, *Barry Minkow Charged in Fraud Against Lennar*, WALL ST. J., Mar. 25, 2011, *available at* http://online.wsj.com/article/SB100014240527487044381045762196 62795056534.html (reporting a defendant's anticipated guilty plea to charges that he induced federal law enforcement to investigate a company, and then bet against that company's stock) (last visited May 31, 2011).

it is doubtful on these facts that any such interest would mirror the ordinary concerns accompanying law enforcement investigations, such as fear of retaliation or harassment. At a minimum, a cognizable privacy interest would need to be identified, and could then, if weak, be discounted in the balancing test. It might also be the case that any risk to personal privacy, if one could be identified, would be no "more palpable than [a] mere possibilit[y]," *Rose*, 425 U.S. at 380 n.19, and so insufficient to justify the redactions no matter the public interest.

Finally, we have long recognized that government officials, particularly those in senior positions, have diminished privacy interests. *See Lahr*, 569 F.3d at 977; *Forest Serv. Emps.*, 524 F.3d at 1025-26. Either complainant could be such an official. Even if a far-fetched possibility, that fact, if true, would be quite pertinent to the weight accorded personal privacy interests in the Exemption 6 balancing test.

**[9]** Nothing on the face of the redacted communications, or any explanatory evidence adduced by HUD, precludes these possibilities. The 2003 Letter reveals no clues whatever as to the complainant's interest in the suspected violations, or as to his relationship to Prudential or the real estate industry. The author of the 2008 Email requested anonymity, suggesting he feared some adverse consequences could ensue from revealing his identity. At the same time, he claimed to have heard of the RESPA violations from an agent at Prudential, indicating, perhaps, that he was not employed there. That inference could well be incorrect, but we would be required to make it, as it is favorable to the nonmoving party on summary judgment. *See, e.g.*, *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011). The bottom line is that absent more information, we are required to speculate about the likelihood that a nontrivial interest is at stake with regard to either complainant, something we are not permitted to do at this procedural stage. *See* Fed. R. Civ. P. 56(c); *Paladin Assocs., Inc. v. Mont. Power, Co.*, 328 F.3d 1145, 1161 (9th Cir. 2003)

(acknowledging summary judgment requires admissible factual support, not conjecture).

This "likelihood" problem—that is, whether there is a substantial probability of an invasion of privacy—does not often arise in cases approving withholding identifying information to protect privacy interests, because ordinarily evidence exists that some privacy concern *will* be infringed. In many cases, courts are aware of characteristics about the protected individuals themselves—for instance, their status as potentially vulnerable emigrants, *see Ray*, 502 U.S. at 176; cadets who had been subject to disciplinary proceedings, *see Rose*, 425 U.S. at 355; or government employees associated with serious allegations of misconduct. *See Forest Serv. Emps.*, 524 F.3d at 1026; *Lane*, 523 F.3d at 1137; *Hunt*, 972 F.2d at 288. In other cases, there is evidence that the protected individuals will be harassed or contacted against their will. *See, e.g.*, *Fed. Labor Relations Auth.*, 510 U.S. at 500-01; *Lahr*, 569 F.3d at 976; *Painting Indus.*, 26 F.3d at 1483; *Minnis v. U.S. Dep't of Agric.*, 737 F.2d 784, 785-86 (9th Cir. 1984). Courts armed with either type of information can make reasonably accurate predictions about how disclosure would affect the protected individuals, and, if privacy interests are determined to exist, can weigh those concerns against the public interests furthered by disclosure. Here, no analogous evidence exists.[3]

**[10]** In sum, HUD has yet to advance evidence sufficient to establish that an invasion of privacy is more than a speculative possibility. The district court, consequently, did not have

---

[3]The district court found that Prudential demonstrated a desire to contact and possibly sue the authors of the complaints. *Prudential*, 646 F. Supp. 2d at 1227. Such a finding, if true, could be evidence that an invasion of privacy would be likely to occur. *Cf. Forest Serv. Emps.*, 524 F.3d at 1026 (holding an invasion of privacy would occur, where the plaintiff planned to contact the individuals whose names were being withheld). HUD, however, does not defend that finding on appeal, and nothing in the record supports it. Accordingly, it cannot constitute a sufficient factual basis for the district court's grant of summary judgment.

an "adequate factual basis" to support its decision. *Lane*, 523 F.3d at 1135. Given the varying degrees of personal privacy interests that *could* be at stake, HUD's attempts to meet its burden have not been "detailed enough for the district court to make a *de novo* assessment of the government's claim of exemption." *Maricopa*, 108 F.3d at 1092 (citation and quotation marks omitted). In other words, absent some information about who the informants are, or what privacy interests are likely to be infringed, the government has not shown "*some* nontrivial privacy interest" is at stake. *Forest Serv. Emps.*, 524 F.3d at 1027 (citation and quotation marks omitted). It follows that, without more from HUD, it is impossible to weigh the privacy and public interests implicated by releasing the redacted information.[4]

[11] We therefore remand to allow the district court to conduct such additional proceedings as it deems necessary.[5]

---

[4]Prudential challenges the weight accorded by the district court to the public and privacy interests in its balancing analysis. We express no opinion on those arguments, other than to note that the government redacted a limited amount of identifying information, and the court is to assess "the marginal additional usefulness" of that withheld information. *Forest Serv. Emps.*, 524 F.3d at 1027 (citation and quotation marks omitted); *Lahr*, 569 F.3d at 978 (recognizing that this court has "viewed skeptically the assertion that the public interest is materially advanced by disclosing names of individuals redacted from documents already in the public record"). That observation has particular force here: The factual bases underlying the investigations are public, and Prudential's limited request is unlikely to reveal patterns regarding the efficacy or propriety of HUD's practices. *See, e.g., Lane*, 523 F.3d at 1138; *Hunt*, 972 F.2d at 289. In short, like the district court, we are somewhat skeptical that revealing these names will shed much, if any, light on HUD's "performance of its statutory duties" or otherwise let citizens know "what their government is up to." *See U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989) (internal quotation marks omitted; emphasis deleted).

[5]For the reasons given, were HUD to establish only that the complainants are industry insiders, the agency must be prepared for the district court to draw the reasonable inference that that category encompasses managerial employees at a competitor organization with little or no personal privacy interests at stake.

*See Rosenfeld v. U.S. Dep't of Justice*, 57 F.3d 803, 813 (9th Cir. 1995); *Wiener*, 943 F.2d at 979.

### III

Before concluding, we pause to acknowledge HUD's worry that releasing the names of persons who report suspected illegal activity will have a chilling effect on the ability of agencies to investigate legal violations. That concern is valid, but HUD has other tools to protect future informants in the event Exemption 6 proves inadequate.

Exemption 7(D), for example, specifically protects confidential sources.[6] "[A] source is 'confidential,' " under this exemption, "if it 'provided information under an express assurance of confidentiality or in circumstances from which such an assurance could be reasonably inferred.' " *Rosenfeld*, 57 F.3d at 814 (quoting *U.S. Dep't of Justice v. Landano*, 508 U.S. 165, 172 (1993)). Nothing in the record indicates that the informants were assured their identities would remain confidential, and HUD admits Exemption 7(D) does not apply. But if HUD is worried about not discouraging future complainants, it might consider implementing confidentiality procedures that satisfy the Exemption 7(D) dictates.

Likewise, as previously mentioned, Exemption 7(C) allows

---

[6]Exemption 7(D) protects from disclosure "records or information compiled for law enforcement purposes, but only to the extent" that disclosure "could reasonably be expected to disclose the *identity of a confidential source*, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source." 5 U.S.C. § 552(b)(7)(D) (emphasis added); *see also Church of Scientology Int'l v. IRS*, 995 F.2d 916, 919 (9th Cir. 1993) (acknowledging that "civil as well as criminal law enforcement activities are within the purview of" Exemption 7 (citation omitted)).

agencies to withhold "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). That exemption requires less from the government to justify withholding information than Exemption 6, both in terms of the likelihood that an invasion will result and in determining whether such an invasion would be "unwarranted." *See supra* note 1 and accompanying text. It too might be invoked in the future.

In light of the FOIA's goal of "broad disclosure" and the Supreme Court's repeated "insist[ance] that the exemptions be given a narrow compass," *Milner*, 131 S. Ct. at 1265 (citation and quotation marks omitted), we must be cautious not to interpret the exemptions so broadly that they "tend to engulf" one another. *Id*. at 1270. Given the plausible applicability of at least three different exemptions to situations like this one, we are mindful of our duty to police their boundaries.

We therefore vacate the grant of summary judgment to HUD and remand to allow the parties to develop an adequate factual basis for the district court to determine whether the information at stake may be withheld pursuant to Exemption 6.

Each side shall bear its own costs on this appeal.

**VACATED and REMANDED.**